[No. B045631. Second Dist., Div. Three. Nov. 7, 1990.]

MICHAEL P. MILAZO, etc., et al., Cross-complainants and Respondents, v.
GULF INSURANCE COMPANY et al., Cross-defendants and Appellants.

1530

COUNSEL

Norby & Brodeur, Paul D. Loreto and Cynthia R. Bozzone for Cross-defendants and Appellants.

Westrup, Kincaid & Klick and Mark L. Kincaid for Cross-complainants and Respondents.

OPINION

**CROSKEY, J.**—In this case, a duplicitous partner seeks to obtain indemnification under a partnership liability policy for the damages caused to his innocent copartners by his misappropriation of a partnership opportunity.

We are presented with the appeal of the cross-defendant Gulf Insurance Company (Gulf) which challenges a summary judgment granted in favor of cross-complainant Michael P. Milazo (Milazo). That summary judgment was based upon the trial court's determination that a partnership liability policy provided individual coverage for the wrongful acts of one of the partners. However, we conclude that the comprehensive general liability policy issued in this case did not provide individual coverage for the partners, but only for their acts *as partners*, and we therefore reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Milazo's cross-complaint was filed in an action brought against him by Julia and Morley Pingle, persons with whom he was in partnership in a retail meat market business entitled "Alexander's Choice Meats" (hereinafter, the Alexander partnership or Alexander's). Milazo and another person, Millard Ellis, were the limited partners and the Pingles were general partners. The partnership premises were subleased from a business entitled "Howie's Ranch Market, Inc." (Howie's). Howie's in turn had leased the property from another partnership in which Milazo was also a partner—H.M.K. Properties. The other members of that partnership were Duncan Howie and Ryo Kuroki.

In 1984 the Pingles brought suit against Milazo (hereinafter the Pingles' action), claiming he had interfered with their ability to obtain a new sublease on the Alexander partnership premises.[1] In their second amended

---

[1] A five-year extension of an existing sublease was due to expire on July 14, 1982. The Pingles allege that prior to Milazo's actions they had obtained on behalf of the partnership an

complaint, the Pingles alleged that without their knowledge or consent, Milazo and Duncan Howie agreed that Howie's Ranch Market would refuse to extend the Pingles' lease, that Duncan Howie would take over the Pingles' interest in the meat market and that Milazo would receive a right of first refusal on Duncan Howie's interest in the premises and the meat market.[2] The Pingles sued Milazo both as an individual and as a partner of the Alexander partnership. In their complaint they alleged that the various wrongful acts of Milazo were done both in his capacity as a partner of the Alexander partnership and as an individual.

At an earlier point in time, Gulf's predecessor had issued two successive comprehensive general liability insurance policies to the Alexander partnership. Milazo claimed coverage under both of those two policies for any liability he might have in connection with the Pingles' action. Gulf agreed to provide a defense to Milazo under a reservation of rights, including the right to seek reimbursement of any settlement proceeds expended by Gulf on behalf of Milazo. In his third amended cross-complaint, Milazo asked for declaratory relief against Gulf on the issue of the coverage for Milazo under Gulf's policies and Gulf's claimed right to reimbursement of defense and settlement expense.

The Pingles' action was tried to a jury. The jury returned a general verdict against Milazo on the bifurcated issue of his liability to the Pingles, finding him liable to them on three of their causes of action, (1) breach of fiduciary duty by usurpation of partnership opportunity, (2) negligent interference with existing economic advantage and (3) negligent infliction of emotional distress. After that verdict, the Pingles and Milazo reached a settlement in which Gulf concurred subject to its reservation rights.[3] Under the terms of the settlement it was agreed that Gulf would pay $300,000 on Milazo's behalf in full settlement with the Pingles and they in turn would give Milazo a general release and would dismiss him with prejudice from

---

oral agreement for a 10-year extension of that sublease, subject only to the obtaining of a zoning variance which in fact was later granted.

[2] These allegations, taken together with Milazo's membership in the partnership which was the master lessor, make it clear that his alleged interference with an economic opportunity of the Alexander partnership was a misappropriation of a partnership right or interest for his own account.

[3] Gulf in its opening brief states that the agreement to provide Milazo with a defense and to provide the funds for any negotiated settlement included Milazo's "express consent" to reimburse Gulf for any amount paid on account of such a settlement. However, our review of the record provides no support for this claim. In view of our determination to reverse the judgment and remand for further proceedings, this issue can be considered and resolved by the trial court in accordance with settled rules applicable to an insurer's claim for reimbursement of settlement expense (*Johansen v. California State Auto Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744]) and defense costs (*Val's Painting & Drywall, Inc. v. Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 585-588 [126 Cal.Rptr. 267]).

their action. The settlement included a provision that the $300,000 would be based on the negligent infliction of emotional distress cause of action rather than all three causes of action. This was apparently done so that the Pingles could avoid payment of taxes.[4]

Later, Milazo filed a motion for summary judgment, or alternatively for summary adjudication of issues, on his cause of action against Gulf for declaratory relief. To defeat the motion, Gulf did not submit evidence with its opposition papers but rather relied on the language in the general verdict and the language of the insurance policies.

Gulf claimed that Milazo was covered under the policies *only* in his capacity as a partner in the Alexander partnership and that there was a triable issue of material fact as to whether he was acting in that capacity when he performed the acts which injured the Pingles.[5] In response, Milazo argued that the wording of the policies shows that he was insured in an individual capacity as well as a partnership capacity. He further argued that he was held liable to the Pingles as a partner of Alexander's and therefore, even if he were only insured in his capacity as a partner, he was covered by the policies. This latter argument apparently rests upon the proposition that Milazo's conduct amounted to a breach of fiduciary duty and since he only owed such duty by virtue of his status as a partner, his act of breach was necessarily accomplished "as a partner."

These arguments were persuasive to the trial court and it found that (1) Milazo was insured "as an individual and dba Alexander's Choice Meats" under the policies; (2) "there are no exclusions in either [policy] with respect to the acts of one partner as against another partner"; (3) "Emotional distress, negligently inflicted by an insured during the policy period is a covered act under the personal injury liability sections of [the policies]";[6] (4) given the jury's verdict in favor of the Pingles on all three causes of action, "The only reasonable interpretation of the jury's verdict is that there was damage to Alexander's Choice Meats partnership of Pingle, Milazo and

---

[4] It was also done after the fact and as a part of the postverdict settlement process. However, it can have no impact on our resolution of this case. That the parties may have chosen to allocate an agreed amount of damages in a particular way, based upon an undifferentiated jury determination of liability, cannot prevent us from recognizing the realities involved. The evidence demonstrated that Milazo misappropriated a partnership asset. Whether or not such conduct also had the effect of causing the Pingles emotional distress is an issue which we need not here consider. What is important is that Milazo's actual conduct has a dispositive impact on our conclusion as to coverage under the Gulf policies. The parties may not avoid that conclusion by choosing to clothe the Pingles' negotiated damage claim in a different costume.

[5] The relevant policy language is discussed in detail, *post.*

[6] Gulf does not dispute that negligent infliction of emotional distress was a covered act under the policies.

Ellis, because as a result of the acts committed by Milazo, that partnership was dissolved, and a new partnership was formed with Duncan Howie, Michael Milazo and Millard Ellis."[7]

The court determined that as between Milazo and Gulf, (1) there are no triable issues of material fact, (2) Milazo is entitled as a matter of law to a favorable ruling on his cause of action for declaratory relief and (3) Gulf was not entitled to a reimbursement from Milazo of the $300,000 settlement payment it made to the Pingles.

DISCUSSION

### 1. *Standard of Review*

Code of Civil Procedure section 437c, subdivision (c) provides that a summary judgment should be granted only if the papers submitted "show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ▆ In an appeal from a summary judgment, the order which granted that judgment must be reviewed de novo. (*Price* v. *Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 474 [261 Cal.Rptr. 735].)

On appeal from a summary judgment, the reviewing court is not bound by the trial court's construction of a contract where that construction was not based on the credibility of conflicting extrinsic evidence as to which the trial court was in a better position to form a judgment. Thus, where there is no extrinsic evidence, where the extrinsic evidence is not conflicting or where the conflicting evidence is of a written nature only, the reviewing court is not bound by the rulings of the trial court but rather must make an independent interpretation of the written contract. (*Coopers & Lybrand* v. *Superior Court* (1989) 212 Cal.App.3d 524, 529 [260 Cal.Rptr. 713]; *Estate of Shannon* (1965) 231 Cal.App.2d 886, 890-891 [42 Cal.Rptr. 278].) These rules apply to contracts of insurance. (*Ray* v. *Farmers Ins. Exchange* (1988) 200 Cal.App.3d 1411, 1415-1416 [246 Cal.Rptr. 593].)

### 2. *The Terms of the Subject Insurance Policies*

The two comprehensive general liability policies at issue in this appeal were written by Insurance Company of the Pacific Coast, Gulf's predecessor. Gulf assumed the obligations of both of these policies. The first policy

---

[7]In addition, at the hearing on the motion for summary judgment, the trial court orally stated that since the jury found that Milazo had breached the fiduciary duties he owed to the Pingles as a partner of Alexander's, then the jury must also have impliedly found that Milazo was acting as a partner of Alexander's when he did his wrongful acts.

was issued September 1982 for the period September 1, 1982, to September 1, 1983. "Item 1" of the "declarations" portion of that policy states that the "named insured" on that policy is "M. H. Pingle, M. Miloza [*sic*] & Millard Ellis dba: Alexander's Choice Meats." The second policy was issued for the period September 1, 1983, to September 1, 1986. The named insured in item 1 of the declarations is listed as "Duncan Howie, Michael Milaza [*sic*] and Millard Ellis, partners, dba Alexanders [*sic*] Choice Meats."[8]

"Item 3" in the declarations portion of both policies begins: "The Named Insured is:" and then the following printed choices are set out: "Individual," "Partnership," "Corporation," "Joint-Venture," and "Other." In each policy, the "Partnership" box is checked.

The policies are "multi-peril" policies. They provide coverage for damage to the insured's personal property (section I) and for crimes resulting in loss to the insured (section III). Coverage is also provided for liability of the insured for bodily injuries and property damage (section II). Milazo claims coverage under section II.

The liability portion (section II) of the policies provides in relevant part:

(1) "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury or . . . property damage to which this insurance applies caused by an occurrence . . . ."

(2) An "occurrence" is "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

(3) The "named insured" is "the person or organization named in item 1 of the declarations of this policy."

(4) The "insured" is "any person or organization qualifying as an insured in the 'Persons Insured' provision of the applicable insurance coverage." That definition goes on to state that, "The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability."

---

[8] We decline Milazo's invitation to place significance on the failure of the earlier policy to use the word "partners," even though it was used in the later policy. It is plain that each policy was issued to a business entity in which the named individuals were in fact partners and that the partnership nature of the entity was so understood by Milazo. The question presented to us is not whether the entity was a partnership but whether Milazo was provided with coverage under the policies.

With respect to the "Persons Insured" provision to which reference is made in the definition of "insured," that provision includes the language: "Each of the following is an insured under this insurance to the extent set forth below: [¶] (a) if the named insured is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the named insured with respect to the conduct of such a business; [¶] (b) *if the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such*; . . ." (Italics added.)

3. *Partnership, Not Individual, Coverage Was Provided Under the Policies*

■ When construing the various provisions of an insurance contract, the words used in those provisions are to be given the meaning that a layperson would ordinarily give to them. (*Ray* v. *Farmers Ins. Exchange, supra,* 200 Cal.App.3d at p. 1416.) ■ In addition, the portions of a contract, including an insurance contract, are read together as a whole, using the various clauses to help interpret the others. (*Harris* v. *Klure* (1962) 205 Cal.App.2d 574, 578 [23 Cal.Rptr. 313]; *Ray* v. *Farmers Ins. Exchange, supra,* 200 Cal.App.3d at p. 1416.)

■ With these principles in mind, our review of these various provisions convinces us that Milazo qualifies as an "insured," but only with respect to his liability as a partner of Alexander's because it is only the partnership that is a "named insured." The express language of the policies, when read together as a whole, contradicts Milazo's claim that because his name appears in the "Item 1/Named Insured" portion of the declarations, he was covered in an individual capacity.

The definition of "named insured" is "the person *or* organization named in Item 1 of the declarations of this policy." (Italics added.) Here, both the partnership *and* its partners are named in item 1. However, the partners were listed as a "dba"; that is, they were an integral part of the business entity which admittedly was a partnership. Lest there be any question about it, the policy (in item 3) *specifically states that the named insured is a partnership.* Thus, we conclude that it is the partnership which is the named insured. Milazo, as an individual, was not a named insured and was not provided coverage in his individual capacity. ■ ■ ■ ■ There was

clearly no intent to do so and neither he nor the partnership could reasonably have expected otherwise.[9]

### 4. *Milazo's Conduct Created No Partnership Liability*

Gulf contends that summary judgment was not properly granted because there is a triable issue of material fact as to whether Milazo was acting as a partner of Alexander's when he did the acts of which the Pingles complained. If he was not, argues Gulf, the policies would not cover Milazo's acts because he would not be a "person insured." Gulf emphasizes that the policies specifically state that when the named insured is a partnership, the partners are insured *only* with respect to their liability *as partners*.

■ Gulf, noting that the Pingles alleged in their complaint that Milazo acted both in the capacity as an individual and as a partner of Alexander's, argues that the general verdict delivered by the jury did not establish in which capacity he acted. Gulf further argues that even if there were an express or implied finding by the jury on this question, it would not be binding on Gulf because Gulf reserved its rights on the issue of coverage (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 279 [54 Cal.Rptr. 104, 419 P.2d 168]) and because there could be no collateral estoppel effect of such a jury finding since Gulf was not a party nor in privity with a party in the trial of the Pingles' case against Milazo (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co, supra,* 41 Cal.3d at p. 910).

We concur with this argument and agree that under the terms of the policies, coverage for Milazo only existed for his liability *as a partner* and that such issue could not be resolved *against* Gulf in the Pingle action. Thus, it would be an unresolved issue in this case which would preclude summary judgment. However, we believe that the facts of this case warrant a more dispositive analysis.

The purpose of the policies at issue here is to protect the partnership from *partnership* liabilities; because a partnership's liability can extend to its

---

[9] While it is true that ambiguities in the provisions of an insurance policy will ordinarily be resolved in favor of the insured to protect the insured's reasonable expectations of coverage, an ambiguity only exists in a provision if that provision is capable of two or more reasonable constructions. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) Whether there is indeed an ambiguity is a question of law. (*Ibid.*) In the instant case, where the named insured is three people who are designated as a "dba" and where the policy specifically states that the named insured is a partnership (rather than (1) three individuals or (2) three individuals and the partnership), it would not be reasonable to say that those three people are insured as individuals separate and apart from their coverage as partners. This conclusion is supported by the premium structure for the subject policies. The premiums charged were based upon the rating for a retail meat market business. There was no recognition whatever given to providing general liability coverage for the acts of the individual partners apart from their partnership capacities.

partners, the coverage also extends to them, but *only* to the extent of their liability *as partners*. In the instant case, no one (not even the Pingles) argues that liability on the part of the Alexander partnership ever existed, or indeed was ever claimed. Contrary to the trial judge's misconception of the jury's finding of liability (see fn. 7, *ante*), the fact of Milazo's status as a partner, while sufficient to create the fiduciary relationship which was breached by his wrongful acts, did not establish that such acts were committed in his capacity as a partner; or, to put it another way, merely because Milazo's acts would not have been wrongful as to the Pingles but for their partnership relation is not a logical basis for concluding that such acts were done on behalf of the partnership.

■ The status of partner, without more, provides only the authority to bind the partnership by acts "which are apparently within the usual course of the particular business" of the partnership. (*Owens* v. *Palos Verdes Monaco* (1983) 142 Cal.App.3d 855, 865 [191 Cal.Rptr. 381], quoting from *Ellis* v. *Mihelis* (1963) 60 Cal.2d 206, 217 [32 Cal.Rptr. 415, 384 P.2d 7].) A partner, without the consent of *all* of the remaining partners, has no authority to do any act which is destructive of the partnership or, indeed, any act which is not apparently done for the purpose of carrying on the partnership business in the "usual way." (See Corp. Code, § 15009, subds. (2) and (3)(c)[10]; *Ellis* v. *Mihelis, supra*, 60 Cal.2d at pp. 217-218; *Patel* v. *Patel* (1989) 212 Cal.App.3d 6, 9 [260 Cal.Rptr. 255].) Certainly, Milazo's conduct in destroying the partnership's opportunity to remain in business could not be considered within the usual course of activity of a retail meat market.

---

[10] Corporations Code section 15009 provides:

"(1)   Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. For purposes of this subdivision, 'knowledge' includes constructive notice pursuant to Section 15010.7.

"(2)   *An act of a partner which is not apparently for carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.*

"(3)   Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to:

"(a)   Assign the partnership property in trust for creditors or on the assignee's promise to pay the debts of the partnership.

"(b)   Dispose of the goodwill of the business.

"(c)   *Do any other act which would make it impossible to carry on the ordinary business of a partnership.*

"(d)   Confess a judgment.

"(e)   Submit a partnership claim or liability to arbitration or reference.

"(4)   No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction." (Italics added.)

■ To hold that a partner could be covered under a partnership general liability policy for his acts *against* the very business organization that gives him his status as an insured person would turn the concept of partnership coverage on its head. We therefore conclude that when a partner acts to misappropriate a partnership asset, interest or economic opportunity or to otherwise deprive the partnership thereof he cannot, as a matter of law, be deemed to be acting in his capacity *as a partner*. There can be no *partnership* liability for such misconduct. Consequently, the breaching partner would have liability only as an individual, not as a partner.

Thus, the coverage provided to Milazo under the Gulf policies with respect to his liability *as a partner* is not available to indemnify him for the amount of the judgment in the Pingle action. Since we have also determined that there is no coverage for Milazo in his individual capacity, Gulf had no obligation to indemnify him. The trial court therefore erred in granting summary judgment.

## Disposition

The summary judgment entered by the trial court is reversed and the cause is remanded to the trial court for further proceedings consistent with the opinions expressed herein. Costs on appeal to Gulf.

Danielson, Acting P. J., and Hinz, J., concurred.

Respondents' petition for review by the Supreme Court was denied January 24, 1991.